T.C. Memo. 1997-321


UNITED STATES TAX COURT


A. LEE PETERSEN AND INI BUILDERS, INC., Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24466-93.                    Filed July 10, 1997.


A. Lee Petersen (an officer), for petitioner INI Builders,

Inc., and pro se.

<u>Kay Hill</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' Federal income taxes and additions to tax as

follows:[1]

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the taxable years in
                                        (continued...)

A. Lee Petersen

| Year | Deficiency | Addition to Tax Sec. 6653(b) |
|------|------------|------------------------------|
| 1984 | -0- | $11,224 |
| 1986 | -0- | 9,074 |

INI Builders, Inc.

| Year Ending | Deficiency | Additions to Tax | |
| | | Sec. 6653(b) | Sec. 6661 |
|-------------|------------|----------------|-----------|
| 9/30/84 | $43,515 | $21,758 | $10,879 |

Having declined, because we lack jurisdiction over the subject matter, to address the argument of A. Lee Petersen (petitioner) that respondent's claims against petitioner were discharged in bankruptcy, we hold that petitioner committed fraud within the meaning of section 6653(b). Because we dismiss INI Builders, Inc. (INI), a dissolved corporation, as a party for lack of jurisdiction, we do not address whether INI is liable for a deficiency or additions to tax for fraud and substantial understatement under sections 6653(b) and 6661.

FINDINGS OF FACT

Background

On August 20, 1993, respondent issued notices of deficiency to petitioner and INI. On November 16, 1993, petitioner timely filed a petition with this Court on his and INI's behalf. At the

[1](...continued) issue. All Rule references are to the Tax Court Rules of Practice and Procedure. Dollar amounts have been rounded to the nearest dollar.

time the petition was filed, petitioner was a resident of Alaska, and INI was a dissolved Alaska corporation that had conducted operations and had its principal place of business in Alaska.[2]

Petitioner timely filed, pursuant to extension, his 1984 Federal income tax return on June 21, 1985. Petitioner timely filed his 1986 Federal income tax return on April 15, 1987. INI's Federal income tax return for the fiscal year ended September 30, 1984 (TYE 9/84), was timely filed on December 15, 1984.

Petitioner received a B.A. degree in economics from Brigham Young University and, in 1959, a J.D. degree from New York University. Petitioner took two elementary accounting courses as an undergraduate. In law school, petitioner studied corporation law and took one elementary tax course. Petitioner is admitted to practice law in New York, Utah, and Alaska. While serving as an assistant U.S. attorney for the District of Alaska from 1968 until 1975, petitioner tried some tax cases. During the years in issue, petitioner was a sole practitioner whose practice included appellate litigation and criminal, corporate, and personal injury law.

---

[2] INI was originally incorporated under Alaska law on Apr. 6, 1983, as PBS of Alaska, Inc. On Aug. 15, 1983, its name was changed to INI Builders, Inc. On Oct. 14, 1991, INI was involuntarily dissolved by the Alaska commissioner of corporations.

Edward A. Burke (Burke) came to Alaska in 1971 as an investigator for the U.S. Customs Service. Later, Burke served as an investigator for the U.S. Drug Enforcement Agency (DEA) until he was dismissed for misconduct. Eventually, with petitioner's assistance, Burke was reinstated by the DEA, with backpay. During the interim period, Burke worked as a construction superintendent for the U.S. Public Health Service, supervising the building of laundry facilities and the erection of water tanks in native Alaskan villages. During this period, Burke developed contacts with the native Alaskan village of Shaktoolik.

In 1983, petitioner and Burke organized INI for the purpose of building water and sewer systems for native Alaskan villages. Prior to May 23, 1984, the outstanding shares of INI were owned 50 percent each by petitioner and Burke.

In August 1983, INI entered into the first of two contracts with the village of Shaktoolik to construct water and sewer systems (Shaktoolik I). In April 1984, INI and Shaktoolik entered into the second contract (Shaktoolik II). Burke was instrumental in obtaining these contracts and was designated the project manager of Shaktoolik I and II.

The contract price for Shaktoolik I was $1,328,800. Under the terms of the contract, Shaktoolik agreed to pay $400,000 on execution of the contract, so that INI could commence operations.

Thereafter, payments were due based on percentage of completion, with 25 percent of the balance due at 25 percent completion, 25 percent at 50 percent completion, 25 percent at 75 percent completion, and 25 percent due at 100 percent completion. The contract price for Shaktoolik II was $1,138,500, with payment terms similar to those for Shaktoolik I.

On December 22, 1983, petitioner and Burke executed a buy-sell agreement with respect to the shares of INI. Petitioner drafted the buy-sell agreement using a form provided by Mutual Life Insurance Co. of New York (Mutual Life). The buy-sell agreement required that upon the death of either shareholder, the surviving shareholder would purchase, and the estate of the deceased shareholder would sell, the stock of the deceased shareholder at a price determined under article 3 of the agreement. Article 3 of the agreement required semiannual valuation of the stock. The purchase price of the decedent's stock was to be based on the most recent valuation unless more than 1 year had elapsed since the valuation, in which case the value of the decedent's stock would be determined, as of the date of death, by agreement of the surviving shareholder and the estate, or by arbitration if they could not agree.

Article 4 of the buy-sell agreement provided for the purchase of insurance from Mutual Life by each shareholder on the life of the other, with the proceeds to be used to fund any

purchase under the buy-sell agreement. The buy-sell agreement provided that, in the event the insurance proceeds were insufficient to pay the full purchase price of the stock in cash, the survivor was required to pay the balance within 5 years, with interest at the prime rate plus 2 percent, and to execute a promissory note on those terms.

As contemplated by the terms of the buy-sell agreement, Burke applied to Mutual Life for a life insurance policy in the amount of $100,000. Despite Burke's having disclosed on the application that he suffered from high blood pressure, Mutual Life issued an insurance policy on Burke's life with petitioner as owner and beneficiary. Burke did not disclose to Mutual Life that he had been treated for chest pains and self-inflicted wrist wounds, and that he was a member of Alcoholics Anonymous.

Burke had prepared the bids for the Shaktoolik projects and had been optimistic that INI would make a substantial profit on them. Petitioner expected a profit of about 10 percent. Schedule A, an addendum to the buy-sell agreement, showed an initial stated value of $75,000 for each shareholder's stock, and insurance policies in the amount of $100,000 each. The addendum, dated December 22, 1983, was signed by Burke and petitioner.

On May 16, 1984, petitioner and Burke signed a new Schedule A, which increased the stated value of each shareholder's stock to $150,000 and assumed that each of the insurance policies in

the amount of $100,000 would remain in force. Also on May 16, 1984, petitioner and Burke agreed that, contingent upon the successful completion of the Shaktoolik projects and sufficient funds being available, Burke would receive a $100,000 bonus. Neither on that date nor at any other time was any formal corporate action ever taken to authorize the payment of a bonus to petitioner.

On May 23, 1984, Burke died intestate of a ruptured aorta. Burke was survived by his mother, Pauline Burke, adopted sons Mark and Robert Thorpe, and his natural children Edward A. Burke, Jr., Michael Thorpe, and Tina Vicnair.

Petitioner volunteered to serve, without compensation, as counsel for Burke's estate. Petitioner successfully petitioned for the appointment of Robert Thorpe (Thorpe) as the personal representative of Burke's estate.

On the date of Burke's death, the Shaktoolik projects were less than 10 percent complete. On May 28, 1984, petitioner, in his capacity as sole remaining director of INI, authorized the hiring of Art Ronimus (Ronimus) to supervise the completion of the Shaktoolik projects.[3] Petitioner also authorized INI to pay all Burke's debts and charge these payments as advances to petitioner for the purchase of Burke's stock. Petitioner caused

---

[3] Ronimus is a professional engineer who had done design work for Shaktoolik I and helped Burke prepare the bid for Shaktoolik II.

INI to hire Carole Sookiayak, Burke's companion and the daughter of the mayor of Shaktoolik, at a salary of $2,000 per month.

On the date of Burke's death, the buy-sell agreement by its terms obligated petitioner to purchase Burke's stock from his estate for $150,000. No later than July 1984, petitioner told Thorpe that INI would not pay a bonus to Burke's estate because the bonus was not due until completion of the Shaktoolik projects and because INI needed the money to pay Ronimus. As a result, Thorpe did not expect that the estate would receive a bonus, but he did expect that the estate would receive $150,000 for the sale of Burke's stock in INI.

By letter dated September 25, 1984, Mutual Life denied petitioner's application for payment of the insurance policy on Burke's life. The stated grounds for the denial were that Burke had failed to disclose on his application that he had been treated for chest pains and self-inflicted wrist wounds and that he was a member of Alcoholics Anonymous.

Petitioner filed a lawsuit for breach of contract to hold Mutual Life liable for the $100,000 face value of the insurance policy on Burke's life. A jury returned a verdict of no liability in favor of Mutual Life. In December 1990, the Alaska Supreme Court affirmed the jury verdict. See Petersen v. Mutual Life Ins. Co., 803 P.2d 406 (Alaska 1990). Under rule 82 of the Alaska Rules of Civil Procedure, which allows a successful

defendant to recoup some or all of the legal fees incurred, a judgment was entered against petitioner in the approximate amount of $70,000.

By October 1, 1984, the Shaktoolik projects were substantially complete and operational, and INI had received payments totaling $1,875,000. The gross receipts reported on INI's TYE 9/84 U.S. corporation income tax return amounted to $1,665,000. INI's TYE 9/84 return reflects taxable income of $87,177 after deductions. INI reported officer's compensation and wages on line 12 of the TYE 9/84 return in the amount of $165,000 and bonuses on line 26 in the amount of $63,800. The $165,000 shown on line 12 of INI's TYE 9/84 return includes the deduction for $100,000 attributable to the accrual of the bonus payable to Burke's estate.

Shortly after Mutual Life denied the insurance claim, petitioner and Thorpe discussed the buy-sell agreement. During this discussion, petitioner told Thorpe he would pay $150,000 for the stock. Petitioner did not try to rescind the buy-sell agreement or reduce the purchase price of the stock; he simply tried to extend the time over which he had to pay.

Later, during fall 1984, petitioner suggested to Thorpe that the estate could be paid faster, on the rationale that a layer of taxation could be eliminated, if the buy-sell agreement were reformed, nunc pro tunc, to reduce the purchase price by $100,000

and make up the reduction with an agreement to pay Burke a bonus in an equivalent amount. Petitioner did not tell Thorpe that his proposal to change the character of the payments would impose an income tax burden on Burke's estate. Thorpe told petitioner he did not care what petitioner did, so long as the estate was not adversely affected.

Virginia Cutshall (Cutshall) is an Alaska certified public accountant who prepared INI's and petitioner's income tax returns and petitioner's amended returns for the years in issue. In preparing INI's TYE 9/84 return, Cutshall used INI's general ledger, corporate minutes, payroll records, and other information provided by petitioner. Cutshall relied on either the corporate minutes or the information received from petitioner in deciding that INI could accrue a bonus payable to Burke. Prior to and at the times of the preparation of petitioner's original 1984 and 1986 income tax returns, petitioner did not inform Cutshall of his efforts to reduce the purchase price of his obligation to buy Burke's stock and to make up the difference with INI bonus payments, nor did he ask for her advice on the tax consequences of the course of action he was trying to implement.

Thorpe did not understand the tax implications of the reformation that petitioner had proposed. Thorpe is a sales manager for an auto dealer. He has not completed high school, nor does he have any tax training; he does not even balance his

own checkbook.  In 1984, Thorpe was 25 years old and anxious to receive distributions from the estate.

Around October 1984, Thorpe consulted Cheryl Scanlon-Hull (Scanlon-Hull), a certified public accountant, with respect to the proposed reformation.  Scanlon-Hull discussed with Thorpe the tax effects to the estate of converting payments due from petitioner to the estate under the buy-sell agreement into a bonus to be paid by INI.  Scanlon-Hull advised Thorpe that the buy-sell agreement was binding and could not be converted to a bonus and that a bonus paid to the estate would be taxable income to the estate.  Thorpe told petitioner that the estate would not agree to petitioner's proposed modification of the agreement because it would create a tax burden for the estate.

Subsequently, but before the end of 1984, petitioner called Scanlon-Hull to discuss her advice to Thorpe respecting the tax effects of converting petitioner's obligation to pay pursuant to the buy-sell agreement into a bonus payable by INI.  Petitioner told Scanlon-Hull he disagreed with her conclusions, and that he had discussed the tax effects with Cutshall, who had advised him that there would be no adverse tax consequences to the estate. Petitioner did not raise the matter again with Thorpe.

In December 1984, INI made a payment to Burke's estate in the amount of $50,000.  INI made another payment to Burke's estate in 1986 in the amount of $17,500.  Petitioner asserts that

these amounts were payments on Burke's $100,000 bonus, which INI had accrued in TYE 9/84. As payments were received by the estate, Thorpe made no distinction between payments the estate received from INI and payments received from petitioner personally; Thorpe accepted and treated all moneys received from petitioner and INI as part payment for the stock.

The Internal Revenue Audit

Between August 1985 and August 1986, INI's TYE 9/84 return was audited by Revenue Agent Douglas Becker (Becker). Petitioner authorized Cutshall to represent INI before the Internal Revenue Service (IRS). During the audit, Becker questioned the deductibility of the accrued bonus to Burke.

Cutshall refused to allow Becker to interview petitioner during the initial audit interview, but they did meet later. Petitioner told Becker that INI had paid $50,000 to Burke's estate as payment on a note for an accrued bonus. Petitioner told Becker that INI's liability to pay a bonus to Burke accrued on the date of Burke's death because both the fact and the amount of the liability were fixed, absolute, and irrevocable at that time. In support of the deduction, Cutshall and petitioner showed Becker minutes from INI's board of directors meeting dated May 16, 1984, and a canceled check for $50,000 dated December 13, 1984.

At the May 16, 1984, INI board of directors meeting, petitioner took notes. These notes are no longer in existence, having been destroyed by petitioner when he prepared the minutes. The front page of the minutes sets forth May 18, 1984, as their date, which is a typographical error. The last page of the minutes is signed by petitioner and dated May 16, 1984. However, the minutes were not transcribed in May 1984, nor did petitioner sign the minutes in May 1984. The minutes note that the initial value of each shareholder's stock was set at $75,000, omit any reference to the increase in valuation to $150,000, and state that, instead of allowing the value of the corporate stock to increase, the shareholders would take any excess profits in bonuses. The minutes state that petitioner moved to approve a bonus to Burke in the amount of $100,000 because he was principally responsible for obtaining the contracts. The minutes further state that Burke may be given a promissory note to be paid when funds are available. During the audit, petitioner took the position that the May 16, 1984, minutes constituted a demand note for the bonus.

Petitioner knew that Becker would rely on the May 16, 1984, minutes in making his audit determination. The May 16, 1984, minutes and canceled check for $50,000 induced Becker to allow INI to take a deduction for the bonus of $50,000, the amount Becker believed had actually been paid. Becker would not have

allowed INI any deduction for the bonus if he had not seen the minutes and the canceled check.  Becker issued an examination report that disallowed half of the $100,000 deduction INI claimed for the bonus payable to Burke.

Appeal of the Examination Report

INI protested Becker's findings.  An Appeals conference was held on March 5, 1987.  The Appeals officer was William O'Meara (O'Meara).  To support the deduction for an accrued bonus of $100,000, petitioner and Cutshall showed O'Meara a document entitled "Agreement for Payment of Debts and Distribution of Estate" (Heirs' Agreement), a letter dated June 2, 1987, and several canceled checks.

Petitioner drafted the Heirs' Agreement for the distribution of Burke's estate.  There are three different versions of the agreement (Heirs I, Heirs II, and Heirs III).  Paragraph 1.b. of Heirs I reads:

> Receivables from and interest in INI Builders.
> Inc. At the time of the death of Edward A. Burke,
> amounts owed by INI Builders, Inc. to him and the value
> of his stock, pursuant to a buy-sell agreement, totaled
> $150,000.  The personal representative has collected
> $170,242 [sic] of this amount, the personal
> representative has agreed after all parties have signed
> this agreement to accept, and an additional $50,000 is
> to be collected when the City of Shaktoolik makes
> another payment on the contract with INI Builders, and
> a promissory note from A. Lee Petersen in the amount of
> $30,757.51, with 14% interest per annum, payable in
> full within two years, in full settlement of amounts
> owed by INI Builders, Inc. to Edward A. Burke and for
> the stock of Edward A. Burke in the corporation.

The sentence in Heirs I stating that the personal representative of Burke's estate had collected $170,242 contains a typographical error; it was intended to read "$70,242".  The sentence is also garbled.  Heirs II contains a correction of the typographical error in paragraph 1.b. and makes the sentence referenced above grammatically coherent.  Heirs III contains the correction made in Heirs II, bears the signatures of the heirs, and contains additional changes to paragraph 1.b.  Paragraph 1.b. of Heirs III reads:

> Receivables from and interest in INI Builders. Inc.  At the time of the death of Edward A. Burke, amounts owed by INI Builders, Inc. to him were a $100,000 bonus and $20,242 in management and other fees.  The personal representative has collected $70,242 of these amounts.  An additional $50,000 is to be collected when the City of Shaktoolik makes another payment on the contract with INI Builders, Inc.  A promissory note from A. Lee Petersen in the amount of $30,757.51, with 14% interest per annum, payable in full within two years, will be accepted in full settlement of the balance owed for the stock of Edward A. Burke in the corporation.

Thorpe and his brothers signed Heirs I containing the typographical error in paragraph 1.b., then gave the signed copies to petitioner.  Thorpe never signed or reviewed Heirs II or Heirs III.  Heirs III is the version of the Heirs' Agreement petitioner showed O'Meara.

The terms of Heirs III raised a question in O'Meara's mind as to whether the payments for which INI had taken a deduction were made in payment for the stock or as a bonus.  To obviate

O'Meara's concerns, petitioner submitted a letter dated June 2, 1987, which was purportedly signed by Thorpe.

There are two different versions of the June 2, 1987, letter (June 2, 1987 I and June 2, 1987 II).  June 2, 1987 I lists a schedule of payments labeled "Payments made by INI Builders, Inc." and "Payments made by A. Lee Petersen".  Petitioner's alleged payments include 10 payments of $2,000 each, a $28,757 payment for legal services rendered to the estate, and an additional amount of $1,612.  The 10 payments of $2,000 were payments made by INI to Carole Sookiayak.  The $1,612.32 was petitioner's fee for representing Thorpe in an employment-related matter.  Petitioner never billed the estate for the $28,757.51 in legal fees; he represented the estate free of charge.

On June 26, 1987, petitioner visited Thorpe at his office and presented June 2, 1987 I.  Because Thorpe disagreed with the accuracy of the amounts paid according to the letter, petitioner made a handwritten notation on Thorpe's copy of June 2, 1987 I that reads:  "As of this date the total payments for which credit should be allowed against a total of $150,000 is about $97,000-".  This notation is dated June 26, 1987.  Thorpe signed June 2, 1987 I even though the letter contained errors as to the amounts paid to the estate.  Petitioner never asked Thorpe for permission to make any changes to the letter, nor did petitioner inform Thorpe

he was going to "fix" the letter.  After being asked to sign June 2, 1987 I, Thorpe began to lose faith in petitioner.

June 2, 1987 II lists, separately, "Payments made by INI Builders, Inc. on the $100,000 note for bonus", totaling $67,500, and "Payments made by A. Lee Petersen, including credits for services, on purchase of corporate stock" (emphasis added), totaling $50,369.83.  The second page of June 2, 1987 II bears petitioner's signature and Thorpe's signature indicating agreement with the figures, dated June 26, 1987.  Thorpe did not sign June 2, 1987 II.  The signature pages of June 2, 1987 I and June 2, 1987 II are one and the same; petitioner attached the signature page of June 2, 1987 I to the first page of June 2, 1987 II.

Petitioner knew O'Meara would rely on Heirs III and June 2, 1987 II.  O'Meara relied on Heirs III and June 2, 1987 II in reaching the conclusion that the $100,000 bonus was fully deductible.  He would not have allowed the deduction without having received these documents.  O'Meara determined that no additional tax was due from INI and issued a no-change letter closing the appeal on July 21, 1987.

Settlement Between Petitioner and Burke's Estate

Early in 1988, respondent became aware of the inconsistency between the estate's and INI's treatment of the payments that INI had made to the estate. The IRS contacted Thorpe regarding the estate's failure to file Federal income tax returns for the $100,000 "bonus" from INI. Scanlon-Hull had never seen a Form 1099 for any of the bonus payments. Petitioner had previously told Thorpe that the taxable estate was going to be less than $300,000, so that a Form 706 would not be required. Thorpe told petitioner that the IRS was asking Burke's estate to file an income tax return reporting $100,000 of income from INI. In a letter dated February 25, 1988, petitioner urged Thorpe not to file any tax returns until petitioner had had the opportunity to review and discuss them with him to ensure consistency with INI's treatment of the payments.

Around February 1988, Thorpe retained Laurel Peterson (Peterson) and Rodney Kleedehn (Kleedehn) as new counsel for Burke's estate. In May 1988, petitioner met with Peterson, Kleedehn, and Scanlon-Hull to discuss a settlement between petitioner and the estate. During the settlement negotiations, petitioner urged Thorpe to file an income tax return for the estate declaring bonus income from INI. Petitioner offered to pay the estate's income tax liability attributable to reporting the payment received from INI as a bonus. Thorpe and the estate

rejected petitioner's offer. Burke's estate filed Federal income tax returns treating the payments from INI as payments pursuant to the buy-sell agreement.

By letter dated July 7, 1988, petitioner proposed a settlement under which he would amend his returns to show INI's payments to the estate as bonus income to himself. Furthermore, under petitioner's proposed settlement, the estate would accept $25,176, plus interest, as payment in full for Burke's stock. The form of agreement prepared by petitioner was never signed, but the estate negotiated a check from petitioner in the amount of $15,176 bearing the notation that it was in full settlement of any claims against INI or petitioner, exclusive of tax, interest, or penalties arising from the stock purchase or petitioner's conduct.[4]

Ultimately, Burke's estate was paid $150,029. INI made payments totaling $90,741 to Burke's estate and Burke's creditors. Petitioner made payments to the estate in the amount of $57,676, and rendered legal services to Thorpe on a personal matter for which petitioner would have charged $1,612. Only one of the checks in evidence bears a notation that it was a payment on the stock purchase. No check bears a notation that it was a payment on the bonus.

---

[4] In addition to the $15,176 check, petitioner endorsed to the estate a check payable to petitioner, drawn on INI's account, in the amount of $10,000.

The Audit Reopened

By letter dated November 21, 1989, the IRS reopened its audit of INI. Petitioner responded by submitting to the IRS a signed statement that purported to explain the events that led to his settlement with the Burke estate. This statement had several documents attached, including a letter from petitioner to Thorpe dated November 30, 1984. The letter sets out a purchase price of $37,500 for Burke's stock, and provides that bonuses in the amounts of $12,500 and $100,000 would be paid to Burke, for a total to the estate of $150,000. It gives petitioner credit for having already paid $6,382 against the $37,500 purchase price for the stock and calls for a $30,757 note, with interest at the rate of 14 percent and payments over a 2-year period. The letter states that petitioner and Burke had agreed to pay excess INI profits out in bonuses instead of allowing the profits to accumulate with the corporation. Page 2 of the letter also calls for Thorpe's signature to indicate agreement. Thorpe did not see the November 30, 1984, letter until sometime in 1986. Thorpe refused to sign the November 30, 1984, letter because the letter was dated 1984 and misrepresented the arrangement between petitioner and the estate. Petitioner told the IRS that the November 30, 1984, letter constituted the actual reformation of the buy-sell agreement. Petitioner admitted at trial that the November 30, 1984, letter is not the actual agreement.

On September 11, 1990, petitioner filed an amended Federal income tax return for 1984 showing additional tax due of $24,917, attributable to recharacterizing as income to petitioner $50,000 paid by INI to Burke's estate.  On October 4, 1990, petitioner filed an amended Federal income tax return for 1986 showing additional tax due of $6,551, attributable to recharacterizing as income to petitioner $17,500 paid by INI to Burke's estate. Cutshall, who prepared petitioner's amended returns, told petitioner that amounts paid by INI to Burke's estate could not be changed to a bonus to petitioner.  Nonetheless, Cutshall prepared petitioner's amended returns showing amounts paid to Burke's estate as income to petitioner.  No return or amended return has ever been filed by INI to reduce the deduction claimed on its TYE 9/84 return for the accrual of the $100,000 bonus payable to Burke's estate.  Petitioner has not paid the additional tax liabilities shown on his amended returns.

Criminal Charges

On March 14, 1991, the Department of Justice presented proposed charges against petitioner to a grand jury.  The grand jury found no probable cause to indict petitioner for filing fraudulent tax returns, but returned a true bill indicting petitioner on three counts of filing false documents with the IRS in violation of section 7207.  The alleged false documents included June 2, 1987 II, Heirs III, and the INI minutes dated

May 16, 1984.  Following a jury trial in June 1991, petitioner was acquitted of all charges.

Petition in Bankruptcy

On March 15, 1993, petitioner filed a petition under chapter 7 of title 11 of the U.S. Code.  The schedule of debts annexed to the petition filed in that proceeding listed the IRS as a creditor in the amount of $86,504 for the taxable years 1984, 1986, and 1987.  On June 22, 1993, the bankruptcy court entered an order releasing petitioner from all dischargeable debts. Petitioner was represented in the bankruptcy proceeding by Roger McShea (McShea).  McShea never received any contact from the IRS concerning the attempted discharge of petitioner's taxes.

INI

On October 14, 1991, INI was involuntarily dissolved by the Alaska commissioner of corporations.  On August 20, 1993, respondent sent notices of deficiency to INI for TYE 9/84, in care of petitioner, and to petitioner for 1984 and 1986.  The deficiency determined against INI is attributable to the disallowance in full of the deduction claimed in respect of the $100,000 accrual of the bonus payable to Burke.  On November 16, 1993, petitioner filed a petition with this Court on behalf of himself and INI.

The parties have stipulated that INI's current and accumulated earnings and profits for the years in issue were

sufficient to render distributions to petitioner in the amounts of $50,000 for 1984 and $17,500 for 1986 fully taxable as dividends.

OPINION

Petitioner

Petitioner contends that respondent's claims against him for tax years 1984 and 1986 were discharged in bankruptcy. We first address whether we have jurisdiction so to determine.[5] As a Court of limited statutory jurisdiction, see sec. 7442; Neilson v. Commissioner, 94 T.C. 1, 9 (1990), our subject matter jurisdiction is generally limited to the redetermination of the correct amount of a deficiency determined by the Commissioner. See sec. 6214(a); cf. Swanson v. Commissioner, 65 T.C. 1180, 1184 (1976) (an action commenced in this Court for redetermination of a deficiency is unrelated to the collection of the tax). We lack jurisdiction to determine whether a taxpayer's liability for Federal income taxes has been discharged in bankruptcy. McAlister v. Commissioner, T.C. Memo. 1993-166 (citing Neilson v. Commissioner, supra). Petitioner will have to invoke the jurisdiction of the bankruptcy court to obtain a ruling on the issue of discharge, if and when respondent attempts to collect

_____

[5] We always have jurisdiction to decide whether we have jurisdiction. Sponza v. Commissioner, 844 F.2d 689, 690 (9th Cir. 1988) (citing Weiss v. Commissioner, 88 T.C. 1036, 1040 (1987)).

the additions we determine in this case and the unpaid underpayments of tax reflected by petitioner's amended returns for 1984 and 1986.  See 11 U.S.C. sec. 523(a)(1)(C) (1994).

The issue for our decision is whether petitioner is liable for the addition to tax for fraud.  The fraud addition was enacted to protect the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud.  Helvering v. Mitchell, 303 U.S. 391, 401 (1938).  Before petitioner can be held accountable for the fraud addition, respondent must prove by clear and convincing evidence that:  (1) There was an underpayment of tax, and (2) some part of the underpayment resulted from fraud.  Rule 142(b); Bagby v. Commissioner, 102 T.C. 596, 607 (1994).

In the case of income tax for which a timely return was filed, an underpayment includes a deficiency as defined in section 6211.  Sec. 6653(c)(1).  Section 6211 defines a deficiency as "the amount by which the tax imposed * * * exceeds * * * the amount shown as the tax by the taxpayer upon his return".  However, any amount of additional tax shown on an amended return filed after the due date of the return is also a deficiency for the purpose of determining an underpayment.  Sec. 301.6653-1(c), Proced. & Admin. Regs.  In this case, respondent has not determined a deficiency with respect to petitioner, but

petitioner filed amended returns after the due date showing additional tax of $24,917 and $6,551 for 1984 and 1986, respectively.  Thus, petitioner has underpayments of tax within the meaning of section 6653(c) for the years in question.  As of the time of trial, petitioner had not paid the additional taxes shown on his amended returns for 1984 and 1986.

If any portion of an underpayment is due to fraud, then petitioner is liable for a section 6653(b) addition.  The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud may never be presumed; it must be established by independent evidence demonstrating the taxpayer's fraudulent intent.  Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).  Because direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence, and reasonable inferences may be drawn from the facts in evidence.  Spies v. United States, 317 U.S. 492, 499 (1943).

The courts have developed a nonexhaustive list of indications of fraudulent intent.  These indications include: (1) Understating income, (2) maintaining inadequate records, (3) failing to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failing to cooperate with tax authorities, (7) engaging in or

attempting to conceal illegal activities, (8) failing to make estimated tax payments, (9) filing false documents, (10) dealing in cash, and (11) experience and knowledge of tax laws.  See Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Wheadon v. Commissioner, T.C. Memo. 1992-633.

The record in this case contains evidence of at least four indications of petitioner's fraudulent intent.

First, petitioner understated his income tax liability on his 1984 and 1986 returns as he originally filed them.  The Court of Appeals for the Ninth Circuit, to which an appeal of the decision in this case would lie, has held that expenditures of a corporation constitute constructive dividends if:  (1) The expenditures do not give rise to a deduction on behalf of the corporation, and (2) the expenditures create "economic gain, benefit, or income to the owner-taxpayer."  P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1088 (9th Cir. 1987), affg. T.C. Memo. 1984-549; Meridian Wood Prod. Co. v. United States, 725 F.2d 1183, 1191 (9th Cir. 1984); Palo Alto Town & Country Village, Inc. v. Commissioner, 565 F.2d 1388, 1391 (9th Cir. 1977), remanding T.C. Memo. 1973-223.  INI made payments to Burke's estate, which petitioner originally contended were made in respect of a bonus that INI owed to Burke on the date of his death.  We are unpersuaded.  The evidence in the record, contrary

to petitioner's self-serving testimony, convinces us that the payments INI made to Burke's estate were in satisfaction of petitioner's contractual obligation to purchase Burke's shares in INI from the estate. The buy-sell agreement provides, in clear and unambiguous language, that petitioner was obligated to purchase Burke's shares from his estate for $150,000. Moreover, petitioner and Thorpe agreed shortly after Burke's death that petitioner was bound by the buy-sell agreement. The payments are therefore not deductible as a business expense to INI. The payments conferred a benefit on petitioner to the extent that he was relieved of the obligation to pay for Burke's shares with his personal funds. Thus, the payments give rise to a constructive dividend to petitioner. INI's earnings and profits are sufficient to render the payments fully taxable as a dividend.

Petitioner may well have had grounds for rescission or reformation of the buy-sell agreement by reason of Burke's nondisclosure of his adverse medical history, which led to Mutual Life's refusal to honor the life insurance policy on Burke's life. However, petitioner never sought relief from his obligation in any court, nor did he ever take the position that he was not bound by the terms of the buy-sell agreement, as amended. Burke's estate may have had grounds for a quantum meruit claim for a portion of the $100,000 bonus that was

arguably earned prior to Burke's death.  However, neither Thorpe nor any other heir ever pursued any such claim.

Petitioner caused INI to make payments to Burke's estate to satisfy his obligation under the buy-sell agreement.  Later, petitioner attempted to recharacterize these payments as a bonus, rather than payments for the stock.  This attempted recharacterization, if accepted, would have served two purposes: First, it would have preserved or given rise to an income tax deduction to INI, which petitioner would now own outright, for compensation paid and payable; second, it would have eliminated petitioner's personal tax liability for the constructive dividends arising from INI's payments that were used to help petitioner pay for Burke's stock.  When petitioner filed his income tax returns for 1984 and 1986, he understated his income to the extent he failed to include the constructive dividend amounts.  Petitioner filed amended returns only after respondent had begun an income tax audit of Burke's estate and Thorpe had refused to file fiduciary income tax returns for the estate showing a bonus received rather than payments under the buy-sell agreement.

Second, petitioner's explanations of his behavior have been implausible and inconsistent.  Shortly after Burke's death, petitioner told Thorpe that petitioner would buy Burke's stock from the estate, in accordance with the buy-sell agreement, but

that INI did not owe Burke a bonus.  Later, petitioner caused INI to make payments to Burke's estate in lieu of payments to be made by petitioner personally.  Petitioner characterized the payments made by INI as a bonus to Burke's estate, giving rise to a deduction for INI and income to the estate.  When Thorpe refused to report the payments as a bonus on the estate's tax returns, petitioner recharacterized the payments from INI to Burke's estate as constructive bonus payments to petitioner and filed amended personal returns showing income therefrom.  Thus, petitioner has tried to adopt three different characterizations of the payments he made, and the payments he caused INI to make, in satisfaction of his obligations under the buy-sell agreement. The only explanation for these recharacterizations is found in petitioner's attempts to change the tax consequences of the transaction as originally agreed to by Burke and petitioner, and confirmed by Thorpe and petitioner following Burke's death. Thorpe testified that petitioner then proposed a modification to the deal "to avoid paying some taxes".

Third, following the delays occasioned by Cutshall's refusal to allow Becker to interview petitioner and her failures to produce requested documents, petitioner, once he began to deal directly with Becker, submitted documents that he had falsified. Although a jury found petitioner not guilty of three misdemeanor counts of submission of false statements to respondent, it is

clear from the record in this case--and we are convinced--that petitioner did submit falsified documents to respondent's agents during the audit and Appeals process.  Petitioner's intent in submitting these falsified documents to respondent was to persuade respondent to accept petitioner's assertion that the payments by INI to Burke's estate were payments on an accrued bonus, not payments under the buy-sell agreement.  Cf. Bagby v. Commissioner, 102 T.C. at 607.  Petitioner admitted he gave the IRS false documents in order to satisfy the agent and the Appeals officer that the bonus was deductible, because the "end justifies the means".  Petitioner also admitted that he "went too far" in submitting such documents to the IRS.

The fourth factor indicating that petitioner had fraudulent intent with respect to the understatements found above is the way in which he used his experience and knowledge of the tax laws in this case.  Petitioner tried tax cases as an assistant U.S. attorney, and he currently maintains a general law practice which includes corporate and business law.  Although petitioner took only one law school course on taxation, he is a practicing lawyer and is more knowledgeable about tax law than the average taxpayer.  See Wheadon v. Commissioner, T.C. Memo. 1992-633 (holding lawyer accountable for fraud); cf. Sisson v. Commissioner, T.C. Memo. 1994-545, affd. 108 F.3d 339 (9th Cir. 1996)(holding tax lawyer accountable for fraud).  Scanlon-Hull

testified that she told petitioner that he could not recharacterize payments on the buy-sell agreement as payments on a bonus and that petitioner told her that Cutshall had advised him otherwise. Cutshall testified that, if petitioner had asked for her advice, she would have told him that he could not so recharacterize the payments. Petitioner disregarded Scanlon-Hull's position that he could not convert any portion of his personal obligation to make payments under the buy-sell agreement into bonus payments from INI to Burke's estate. Later when respondent demanded that INI, petitioner, and Burke's estate all treat the INI payments consistently, petitioner attempted to persuade the estate to file amended returns consistent with his story that the buy-sell obligation had been renegotiated and reduced and superseded to that extent by bonus payments from INI. When the estate refused to go along with petitioner's story, petitioner filed amended returns treating the "bonus" payments to Burke's estate as "bonus" payments to petitioner. The fact that petitioner twice attempted to recharacterize the transaction to preserve a colorable claim of an income tax deduction for compensation paid by INI demonstrates that petitioner had enough knowledge about tax law to understand the tax implications of his course of conduct. It was that knowledge that informed his course of conduct, the driving force of which was his desire to get $150,000 into the hands of Burke's estate at the least tax

cost to INI and himself. Petitioner's willful misrepresentation to Scanlon-Hull that he had received tax advice from Cutshall, his decisions not to ask for Cutshall's advice and to keep her in the dark at the times of preparation of his original returns, and to disregard her advice at the time of preparation of his amended returns, support the inferences we draw from all the evidence in the record that petitioner intended and attempted to evade his income tax liabilities.

A taxpayer is liable for the addition to tax for fraud if he had the intent to evade taxes at the time he filed his income tax returns. Cf. Badaracco v. Commissioner, 464 U.S. 386, 394 (1984) (fraud committed when original return filed). A fraudulent original return is not purged by the subsequent filing of a correct amended return. The fraud is committed when the original return is prepared and filed. Id.

We are convinced that petitioner had formed the intent to evade tax before he filed his 1984 tax return on June 21, 1985. No later than July 1984, petitioner told Thorpe that Burke's estate would not be paid a bonus because the $100,000 bonus was contingent on the successful completion of the Shaktoolik contracts. In September 1984, Mutual Life denied petitioner's request for payment under Burke's life insurance policy. At some time in late September or early October 1984, after Mutual Life denied petitioner's claim, petitioner proposed to Thorpe that the

estate could be paid sooner if INI paid the estate a bonus in lieu of petitioner's paying the estate under the buy-sell agreement. Petitioner told Thorpe during that conversation that this proposal would eliminate a layer of taxation. In October 1984, Thorpe discussed petitioner's proposal with Scanlon-Hull, who told him that petitioner's proposal was illegal and would give rise to adverse tax consequences to Burke's estate. Thorpe relayed this information to petitioner who then called Scanlon-Hull to voice his disagreement.

Burke's nondisclosures with respect to his life insurance application, which led Mutual Life to revoke the policy, caused petitioner to feel that he had been denied the benefit of his bargain under the buy-sell agreement. Out of a misperceived moral obligation to provide Burke's heirs with the $150,000 to which they thought they were entitled, and the desire to become sole owner of INI at the least tax cost, without having received the life insurance proceeds, petitioner resolved to pay the heirs $150,000 and acquire ownership of Burke's stock in INI. Petitioner proposed to Thorpe and the estate that INI would pay the estate a $100,000 bonus and petitioner would be relieved of $100,000 of his obligation under the buy-sell agreement. Under petitioner's proposal, the estate would receive $150,000, but petitioner hoped to obtain a deduction for INI and to shield himself from having to include in income a constructive dividend

attributable to the corporation's discharge of his debt to the estate. On Scanlon-Hull's advice, the heirs refused to go along with petitioner's proposal. Having discussed the matter with Scanlon-Hull before the end of 1984, petitioner understood that his proposal was contrary to the terms of the buy-sell agreement and would create an income tax burden on the estate. Despite the heirs' refusal to cooperate, and Scanlon-Hull's admonitions, petitioner instructed Cutshall to prepare and file petitioner's 1984 Federal personal income tax return, which failed to report as income INI's payment of $50,000 to Burke's estate, premised on a renegotiation of the buy-sell agreement that, in reality, had never occurred. Petitioner was determined to carry out his plan of reforming the buy-sell agreement, with or without the cooperation of the heirs. Petitioner's conduct subsequent to the filing of the 1984 and 1986 income tax returns, which includes obtaining Thorpe's signature and putting it on falsified documents that would support the positions petitioner had taken on his tax returns, and then submitting those documents to respondent, convinces us that petitioner had formed the fraudulent intent to evade income taxes on or before the time of filing of his 1984 Federal personal income tax return, and this intent continued through the time of filing of his 1986 return.

We commiserate with petitioner in his partially self-created predicament, but we do not condone the course of action by which

he tried to resolve it.  When Mutual Life refused to honor the insurance policy on Burke's life because of Burke's failure to disclose his adverse medical history, petitioner may well have had grounds for reformation or rescission of the buy-sell agreement.  Petitioner was faced with a dilemma over whether he should honor what he deemed to be his continuing obligation to his old friend and coventurer, Burke, or play hardball and protect his own economic interests at the expense of Burke's family.  Petitioner tried to find a middle ground that would allow full payment of the $150,000 to Burke's heirs, while reducing the adverse tax consequences to INI and himself. Petitioner's chosen path led him into a brier patch of conflict between the estate's and his interests that he attempted to cut through at the expense of the fisc.  Notwithstanding petitioner's conflicted motives, the intent underlying his conduct amounted to tax fraud.  Petitioner is liable for the addition to tax for fraudulent understatement under section 6653(b).

INI

Respondent having issued a notice of deficiency to INI subsequent to its involuntary dissolution, petitioner's filing of the petition on behalf of INI necessarily also occurred subsequent to the dissolution.  On June 13, 1995, more than 1 year after filing the answer to INI's petition, and just 1 week before the date for which the case had been set for trial,

respondent filed a motion to dismiss INI as a petitioner for lack of jurisdiction. Respondent contends that because INI is a dissolved corporation, it lacks the capacity to file a petition with this Court.

As we have observed, it might

> At first blush * * * seem anomalous that respondent would issue a statutory notice of deficiency to a taxpayer and then turn around and say that there is no taxpayer who can petition this Court for a redetermination of the determined deficiency * * *. Yet, section 6212(b)(1) is explicit in its language which permits respondent * * * to send a notice of deficiency to a corporation which has terminated its existence * * * [Great Falls Bonding Agency, Inc. v. Commissioner, 63 T.C. 304, 306 (1974).]

Concerning INI's ability to invoke the Court's jurisdiction by filing a petition, our Rules provide that "A case shall be brought by and in the name of the person against whom the Commissioner determined the deficiency". Rule 60(a). This Court has held that if the person against whom the deficiency was determined lacks the capacity to file a petition with this Court, the petition must be dismissed for want of jurisdiction. Brannon's of Shawnee, Inc. v. Commissioner, 71 T.C. 108, 111 (1978).

Under Rule 60(c), "The capacity of a corporation to engage in * * * [litigation before this Court] shall be determined by the law under which it was organized." We look to the laws of the State of incorporation to determine whether a dissolved corporation has the capacity to sue. See Brannon's of Shawnee,

Inc. v. Commissioner, supra. The capacity of the corporate petitioner to sue under State law is a prerequisite to our jurisdiction. Id. Under Alaska law, an involuntarily dissolved corporation lacks capacity to sue, with one limited exception not relevant here. Alaska Stat. sec. 10.06.678(b) (Michie 1988). On October 14, 1991, INI was involuntarily dissolved by the Alaska Commissioner of Corporations. We therefore regard INI as lacking the capacity to sue at the time petitioner purported to file its petition with this Court.[6]

Although we have some concerns about judicial economy and efficiency--the record contains all the relevant facts and the parties have fully briefed and argued the INI issues--petitioner is not without a remedy. INI is a dormant--probably dead-- corporation, currently in possession of no assets. Respondent

---

[6] Under Alaska law, compliance with the Corporation Act even after a suit has been filed is sufficient to allow a corporation to maintain an action and to prevent dismissal based on the previous default. See Richardson Vista Corp. v. City of Anchorage, 14 Alaska 1 (Alaska 1952). Also, so long as the period of limitations has not expired, the transferees of an involuntarily dissolved Alaska corporation may reincorporate and assert the claims of the dissolved corporation. See Alaska Continental, Inc. v. Trickey, 933 P.2d 528 (Alaska 1997). Under the Federal Rules of Civil Procedure and the Alaska Rules of Civil Procedure, the defense of lack of capacity to sue is waived if not raised "by specific negative averment" in the answer, or by motion before the answer is filed. Fed. R. Civ. P. 9; Alaska R. Civ. P. 9; Summers v. Interstate Tractor & Equip. Co., 466 F.2d 42, 49 (9th Cir. 1972); Brown v. Music, Inc., 359 P.2d 295, 301 (Alaska 1961). Thus, in the Federal courts generally, and in the Alaska State courts, capacity is not a jurisdictional element, and lack of capacity is an affirmative defense.

would be required to pursue petitioner as a transferee to collect any deficiency that we might determine against INI. As we observed in <u>Great Falls Bonding Agency, Inc. v. Commissioner</u>, <u>supra</u> at 307:

> Dismissal of the instant case for lack of jurisdiction will not be the occasion for entry of a decision that petitioner [INI] is liable for the determined deficiencies. Sec. 7459(d). * * * [Petitioner] will thus be free to litigate * * * [his] transferor's liability when * * * [and if his own case is] reached for trial.

We shall continue to follow our longstanding rule, under which we have consistently regarded corporate capacity as a jurisdictional prerequisite. See <u>Brannon's of Shawnee, Inc. v. Commissioner</u>, <u>supra</u> at 114. We therefore grant respondent's motion to dismiss as to INI for lack of capacity. Because we lack jurisdiction over INI, we do not decide INI's liabilities for tax and additions to tax.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent with respect to</u>

<u>petitioner A. Lee Petersen,</u>

<u>and an order of dismissal will</u>

<u>be issued with respect to</u>

<u>petitioner INI Builders, Inc.</u>